## Sanders, et al. v. Consolidation Coal Company.

(Decided June 1, 1920.)

### Appeal from Letcher Circuit Court.

Evidence—Affirming Upon Evidence.—Evidence considered, and adjudged to preponderate in favor of the judgment of the chancellor.

JAMES M. ROBERSON, R. H. COOPER and DAVID HAYS for appellants.

W. H. MAYS, S. E. BAKER, JESSE MORGAN and E. C. O'REAR for appellee.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

On the 29th day of June, 1852, a patent was granted by the Commonwealth of Kentucky to Benjamin Potter and his son-in-law, Greenville Sanders, jointly, for a tract of fifty acres of land, which is situated upon Ben's branch, a tributary of Elk Horn, in what was then Pike, but now in Letcher county. Sanders erected a dwelling house upon, what we will call the "lower end" of the tract, and resided there for several years, but just before or about the commencing of the war between the states, in 1861, he left the land, and so far as the evidence indicates, never returned to it, nor gave it any attention of any kind, although he lived in Pike county until his death, which did not occur until in 1894 or 1895. Whether Benjamin Potter, the other joint patentee, ever lived upon the land until the year 1863 does not appear, but, in that year, he was residing in the house, which Sanders had formerly occupied and while living there, at that time and in possession of the land, claimed ownership of all of it, as the purchaser of Sanders' interest in it. Sanders became a soldier in the Confederate army and

about a year before the termination of hostilities, while at his home at a place then called Mudtown, which is upon the present site of the city of Jenkins, and which was only a few miles from the land, he and a son were captured as prisoners of war by the Federal forces and were confined in prison at Rock Island, Ill., until the close of hostilities in 1865, when Sanders having been released from prison, returned to Pike county, the son having died in prison. After his return from prison, he resided continuously in Pike county, at a distance of from ten to twenty-five miles from the land, until his death, a period of thirty years, but never during that time ever visited the land, nor listed it for taxation, or was ever heard to claim it or any interest, except upon one occasion which will be hereinafter adverted to. In 1868 or 1869 a witness, who resided in the neighborhood of the land, and at one time upon it, relates that he was at the home of Sanders and urged him to return to his neighborhood to reside, when Sanders replied that he had nothing there to return to, that he had sold his property there, and never intended to return, and as before stated, never did so. Isaac Potter, who is a son of Benjamin Potter, one of the patentees, and an uncle of the appellants, deposes that his father and Sanders, by parol agreement, while Sanders was still residing upon the land, partitioned it between them and established a division line between the portions. The portion which lies upon the branch near its mouth and which seems to be about one-half of the land, is for convenience designated in the record as the "lower end" and according to Isaac Potter was assigned to Benjamin Potter, while the remainder of the tract designated as the "upper end" was assigned to Sanders. A fence was erected upon the line of division and has been maintained there ever since. Some time after 1863, but the particular year the record fails to show, Isaac Potter deposes that he purchased from his father the interest which his father claimed in the land, and which he deposes was the "lower end," and as a consideration for the interest gave to his father a horse and a cow. Isaac Potter, however, is entirely uncorroborated by anything in the record relating to his purchase from his father, or the payment by him to his father, of either money or property. The elder Potter seems to have removed from the land and Isaac Potter was in the possession of the "lower end" and re-

siding thereon, until about the year 1874 or 1875, when he sold it to Levi Potter and delivered the possession to him. Isaac Potter deposes that his father executed a deed to him, but if such deed ever existed, it is not shown nor accounted for, and the record is silent as to any person ever having seen or had any knowledge of such deed. The fact of its execution rests altogether in the memory of Isaac Potter, who is now 77 years of age, and the time about which he testifies must have been a half century previous thereto. On February 18, 1874, Greenville Sanders, in consideration of $62.50, in hand paid, except $12.00 for which a lien was retained, sold and by a deed executed by him, conveyed to Isaac Potter a portion of the land designated as the "lower end," describing it in the deed by metes and bounds, and as being a part of a fifty acre survey which had been patented to him and Benjamin Potter, jointly. Isaac Potter deposes that he does not remember any such transaction, or that he ever had the possession of or executed such a deed. Isaac Potter did not convey the land nor any part of it to Levi Potter, when he sold it to him, but at the request of the latter, conveyed the "lower end," together with some other lands, to Benjamin Potter, Jr., a son of Levi Potter, in 1883. Shortly after Isaac Potter had sold the land to Levi Potter, Isaac, upon one occasion, was shown to have pointed out the "upper end" of the tract to the sheriff for sale for some purpose or other, and that Levi Potter to prevent the sale paid a sum slightly in excess of twenty dollars. The deed from Isaac Potter to Benjamin Potter, Jr., does not appear to have been subscribed by Isaac Potter, but the officer certifies that he acknowledged it. When Isaac Potter conveyed to Benamin Potter, Jr., he delivered to him all of the title papers which he held to the land, and thereafter Benjamin Potter conveyed the lower end to the Consolidation Coal Company and delivered all of such writings to its agent. When Levi Potter purchased the "lower end" from Isaac Potter, the latter; according to the statements of both Levi and Isaac, disavowed ownership of the "upper end," upon which there was then a small inclosed field, representing that it was the property of Sanders. Levi Potter, however, from the suggestion of Isaac Potter, according to his statement, took possession of the field and used it and about 1876 sold it to Henry Vanover, by a parol agreement, the con-

sideration for it being certain lands which Vanover sold to him by parol. Vanover at once took possession of the inclosed land upon the "upper end," placing a tenant thereon and asserted ownership to all of the land embraced by the "upper end" of the patent, together with the lands adjoining it upon either side and to the division fence on the side adjoining the "lower end," and from year to year, he continued to clear and inclose more of the land. At the death of Vanover in 1887 his widow and heirs succeeded him in the possession of the inclosed lands in the "upper end" and continued to assert title to all of it by inheritance from Henry Vanover, frequently, if not continuously, occupied it by their tenants, until 1897 or 1898 when Hagan Vanover, a son of Henry Vanover, occupied the land and resided upon it until in 1913; the other heirs of Henry Vanover having conveyed to him a boundary of land, including the "upper end," by deed and he, during his occupancy, claimed title to all the land within the boundaries of his deed. In 1910 he sold and conveyed the land embraced by his deed, and it has passed by mense conveyance to the appellee.

On March 15, 1913, the appellants, who are the children and grandchildren of Sanders, brought this suit alleging that they were the owners by inheritance of an undivided one-half of the land embraced by the fifty acre patent granted to Sanders and Potter in 1852, and praying for a division and an allotment of one-half of it, in severalty, and for an accounting of the profits. The appellee denied the ownership of any part of the land by appellants and asserted title to the "lower end" by conveyances from Sanders, through the Potters, and title to the upper end by conveyances from Hagan Vanover and his vendees, and that Vanover was the owner of it at the time he conveyed it by adverse possession. The chancellor adjudged that the plaintiffs had failed to manifest any right to recover any portion of the land, dismissed their petition and they appealed.

In December, 1886, before the claim of ownership by Henry Vanover, of the "upper end" by adverse possession, could have matured into a title, he sold and conveyed the minerals in the land and thus severed the estate in the minerals from the estate in the surface, and it is insisted by appellants that by reason of such severance that although the title of Vanover, and his successors in

title, may have matured to the surface of the land by adverse possession, the title of appellants to the minerals was unaffected by the adverse possession of Vanover and his successors, and further that the Vanovers not having entered upon, nor claimed the land under any instrument of writing, defining the boundaries, nor to any well marked or defined boundary, that their adverse possession did not extend beyond the inclosures upon the land, within the "upper end." It is, however, not found necessary to enter into a consideration of the foregoing questions relating to the claim by adverse possession of the "upper end" or any part of it, or the extent of title acquired thereby, as from other facts in the evidence the judgment must be adverse to the claims of the appellants. It is conceded by all parties, that the lands were partitioned between Sanders and Benjamin Potter, his joint grantee, and that the line of the division was established and adhered to, until all parties would be now concluded by it, and appellants now claim only an interest in the "upper end" or it in its entirety. The contention between the parties is which portion of the land was assigned, in the division, to Sanders, the ancestor of appellants. While Isaac Potter makes the claim that the "upper end" was the portion assigned to Sanders and upon his memory of the events, which must have transpired nearly sixty years before he testified, must alone be depended upon to sustain the claim of appellants, and this in opposition to the evidence of all other facts from which a contrary opinion may be drawn. In considering the statement of this aged and illiterate man, the fact that he is a near relative of the appellants should not be overlooked. Sanders, while upon the land, resided upon the "lower end;" when he removed, previous to the civil war, he was succeeded in occupancy in the house from which he removed, by Isaac Potter; Sanders declared, according to the testimony of one Vanover in 1868 or 1869, that he had sold his interest in the land, and for that reason could not return to it; in 1874, for a consideration which was probably the full value of the "lower end" at that time, he conveyed it to Isaac Potter by a deed which has since found its way to record and the original into the records of this case, where it is not assailed as not being the act and deed of Greenville Sanders; Sanders resided for over thirty years, after removing from the lands, in the same county,

and never at any time did any act which could be construed into a claim of ownership, except the execution of the deed to Potter by which he conveyed for his own benefit one-half of the lands; doubtless this conveyance was made in consummating the sale, which it was proven that he theretofore had declared that he had made; Isaac Potter fails to give any circumstance, nor is any circumstance in evidence from any source which corroborates the statement that Benjamin Potter, Sr., executed to his son, Isaac, a deed; Sanders and his heirs acquiesced in the occupancy of the land by Vanover, his tenants and heirs, for nearly forty years before the bringing of this action; during that time, the timber or the greater portion of it, was removed and the greater portion of the lands inclosed with fences. The above stated facts cause the evidence to preponderate greatly in favor of the contention that the "lower end" of the patent boundary was assigned to Sanders in the division, and it was that which he and his vendee, Isaac Potter, understood that Sanders owned. The only evidence which is in the record to the effect that Sanders ever claimed any interest in the land after 1862, is the statement of one of the appellants, that a day or two before the death of Sanders, in 1894 or 1895, that he said to him that he owned the fifty acre tract and to investigate it. This testimony concerning the statement of one who is dead, and made by one living for his own benefit, was of course incompetent, but if it was competent, it could have little weight in the face of the fact that although the appellant, who made this testimony, and two or more of the other appellants, were then mature men, they made no investigation, nor took any step to recover the rights which they now claim, for over twenty years after the death of their father, during which time others were occupying the "upper end," clearing and fencing it, and using it as their own. Hence, it is concluded that Sanders, appellants' ancestor, by his deed to Potter, parted with all of his interest in the property.

The judgment is therefore affirmed.